HOWARD J. GILMORE *vs.* BOSTON AND MAINE RAILROAD.

Worcester.  September 28, 1937. — February 1, 1938.

Present: RUGG, C.J., FIELD, DONAHUE, & QUA, JJ.

*Negligence*, Grade crossing, Violation of law.

Evidence required a finding that the operator of an automobile at a grade crossing of a railroad violated G. L. (Ter. Ed.) c. 90, § 15, because with due precaution before he drove onto the crossing he must have seen and heard an approaching train which he knew was expected.

TORT.  Writ in the Superior Court dated December 20, 1933.

After verdicts for the plaintiff in the sum of $5,500 were recorded with leave reserved by *Broadhurst*, J., he ordered entered verdicts for the defendant.  The plaintiff alleged exceptions.

*M. J. Rubin*, for the plaintiff.

*A. S. Houghton*, for the defendant.

RUGG, C.J.  This is an action of tort by the operator of an automobile to recover compensation for personal injuries and property damage arising from a collision between his automobile and the locomotive of a moving passenger train

of the defendant, at a grade crossing on a highway in Worcester known as Lincoln Square, on January 1, 1933. The plaintiff's declaration was in five counts. The first count alleged negligence of the defendant in the management of its locomotive and train; the second count alleged failure of the defendant to give the statutory signal specified by G. L. (Ter. Ed.) c. 160, § 138; the third count alleged failure of the defendant properly to maintain the crossing gates required by law; the fourth count alleged negligence of the defendant in driving its train at an excessive rate of speed at a grade crossing; the fifth count alleged general negligence of the defendant at a grade crossing. The jury took two views of the location. Verdicts were returned in favor of the defendant on counts 1, 2 and 4, and in favor of the plaintiff on counts 3 and 5. The verdicts in favor of the plaintiff were received and recorded on leave reserved under G. L. (Ter. Ed.) c. 231, § 120. The trial judge granted a motion of the defendant to enter verdicts for the defendant on counts 3 and 5 in accordance with leave reserved. The exceptions of the plaintiff bring the case here.

Three sets of tracks, running north and south, make up the crossing at Lincoln Square. A shanty for a gate tender is located in the middle of the square, a very short distance from the westerly side of the crossing. Westbound traffic over the crossing moves one way northerly of the shanty, and eastbound traffic over the crossing moves one way southerly of the shanty. The crossing is provided with gates on each side, which the defendant is obliged by law to maintain. The streets along the crossing and Lincoln Square are public ways, and the railroad is crossed with a public way at grade. The train in this collision was operated by the defendant. The tracks south of the crossing are located between tall buildings on each side, distant from each other forty-three feet at the edge of the sidewalk, and run almost in a straight line southerly for a distance of about seventy feet, then swing to the left on a slight curve of about three degrees to a point three hundred twenty feet from Lincoln Square, and then to the right on

a slight curve.   The distance from the westerly rail of the westerly set of tracks to the northeasterly corner of the building on the westerly side of the tracks is nine and one half feet.   Each of the three tracks has a gauge of four feet, eight inches, and the sets of tracks are seven feet apart.   The nearest any part of these buildings come to the tracks is six and one half feet.   The distance from the curb of the southerly sidewalk to the southerly side of the shanty is forty-two and one half feet.   There was testimony from an engineer, with respect to a plan before him, who pointed out the position of the raised gate at Market Street, which is south of Lincoln Square.   The distance from the southerly side of Lincoln Square to the northerly line of Market Street, measured by the middle of these tracks, is seven hundred thirty-eight feet.

The accident happened at about fifteen minutes past two o'clock in the morning.   It was a dark, cold night, with a north wind blowing.   The plaintiff was travelling east at Lincoln Square, and intended to go over the crossing.   When the plaintiff arrived at the Square, the gates were up.   The plaintiff stopped his automobile about ten feet from the southerly curbstone.   He looked on the tracks, both north and south.   The southerly side was in darkness, like a dark alleyway.   He saw no train coming in either direction. There was no automobile traffic in this part of Lincoln Square.   The plaintiff was very familiar with Lincoln Square, both by day and by night, and had been going through it at about this time, on his way home from work, every morning in the week when he was working nights, for a period of more than four years.   He many times had been obliged to stop for this same train, known as the State of Maine Express.   The plaintiff was about twenty-nine years of age and was employed by the United States Government in the Post Office Department.   He testified that, as he came into Lincoln Square, he stopped to let a car come out of Union Street in front of him; that, at that time, the distance between the right side of his automobile and the right curbing was eight or ten feet; that, after this stop, he put his car in first gear, as it was such a short distance to

the crossing, pulled up to the crossing, stopped about three feet before reaching the gate, looked around, and saw nothing in the street; that the distance from "the right hand side of his car to the right hand curb was about ten feet; that he looked down there to the right, looking south; that he did not see anything when he looked down; that he did not hear anything; that he looked the other way — north — likewise; that he made these observations of looking and listening before he attempted to cross that crossing; that following his second stop he put the car in first, proceeded across, the gates were all up, just as he approached the second track this light flashed in front of his eyes so he looked down the track to his right and saw this onrushing engine, so he automatically pulled sharp to the left to avoid the accident, and as he pulled sharp to the left he was carried with the engine up the track; that his automobile came to rest following the impact up against the railing this side of the Depot;" that when he went over the crossing, his speed was about five miles an hour and, if he put on his brakes, he could stop within two feet; that his brakes were in good working order.

The locomotive was a large one and had a big headlight in front of the stack. It was from that headlight, "when it shot down in front of his eyes," that he first learned of the approach of the train. It is further stated in the exceptions "that he was in the second set of tracks when the headlight struck the front of his eyes; that in other words he had got across both rails of the first tracks and the light hadn't struck him then, and he hadn't perceived the light as he went across the two rails of the first tracks; that he didn't see the light as he went onto the first rail of the first track; that he had crossed the first track and had come to the second when he saw this light; that the front end of his automobile when he saw this light for the first time was on the second set of rails approximately half way across that second track; that the second track was the middle track of three across Lincoln Square; that he couldn't see through the light; that is the reason he looked down the track to see the onrushing train; that the light from the engine blinded

him as it struck him; that it was a sharp piercing light; that he couldn't see through it, in front of his eyes; that when he looked and saw the onrushing engine he knew there was an engine directly in back of the light; that the witness looked at the plan as directed and pointed out where he judged approximately his car was on the second track when he first saw the light from the onrushing train; . . . that it was dark down the alleyway there when he saw that light first in front of his eyes; that he looked down, all he could see was steam and a head out of the cab, and so he sharply swung to the left to avoid it; that he saw that steam lying back from the engine there; that he saw a head out of the cab; that he doesn't know whose head it was; the fireman's he imagines, looking out, on the left side of the locomotive cab; that it had not reached the line of the sidewalk across Lincoln Square at that time; that he could not tell more definitely where it was when he first saw the light, it was down between the buildings there; that those three tracks all come through in the same location somewhere northeast of Union Street, that is, they all occupy the same location and on either side of it; that as you look back towards Union Station there are high buildings on either side of the tracks; that he has crossed this crossing many times in daytime as well as at night; that he is familiar with what can be seen looking down the road towards Union Station."

The verdicts of the jury established that there was no negligence in the management and operation of the train of the defendant. The verdicts also established that the speed of the train was not excessive, and, further, that the statutory signals were given as required by law. It is conceded by the defendant that there was negligence on its part in that the gates for the protection of the crossing were not lowered according to the mandate of the law.

The evidence shows that the plaintiff violated the provisions of G. L. (Ter. Ed.) c. 90, § 15. Its words are: "Every person operating a motor vehicle, upon approaching a railroad crossing at grade, shall reduce the speed of the vehicle to a reasonable and proper rate, and shall proceed cautiously over the crossing. Whoever violates any provision of this

section shall be punished by a fine of not less than ten nor more than fifty dollars." The plaintiff was in a place of safety just before he went into low speed and began to cross the tracks. He was in position to hear and to see the approaching train if he had used the requisite precaution. He did not open the window of his automobile toward the south, whence the light and sound were to be expected. He was familiar with the fact that this particular train was due at that time and place. It seems almost unthinkable that the plaintiff did not see the sharp, piercing and blinding headlight from the onrushing locomotive, or that he did not hear the noise of such a heavy train. The case falls within the authority of numerous decisions. *Fortune* v. *New York, New Haven & Hartford Railroad*, 271 Mass. 101, 105. *Anthony* v. *Boston & Maine Railroad*, 276 Mass. 392, 396. *O'Meara* v. *Boston & Maine Railroad*, 277 Mass. 315. *Klegerman* v. *New York, New Haven & Hartford Railroad*, 290 Mass. 268. *Gaboriault* v. *New York, New Haven & Hartford Railroad*, 289 Mass. 36. *Mailhot* v. *New York, New Haven & Hartford Railroad*, 273 Mass. 277. *Creeley* v. *Boston & Maine Railroad*, 263 Mass. 529. *Allen* v. *Boston & Maine Railroad*, 197 Mass. 298, 301. *Lundergan* v. *New York Central & Hudson River Railroad*, 203 Mass. 460, 464. Cases like *Jones* v. *New York, New Haven & Hartford Railroad*, 275 Mass. 139, *Lincoln* v. *New York, New Haven & Hartford Railroad*, 291 Mass. 116, 119, and *Eisenhauer* v. *Boston & Maine Railroad*, 285 Mass. 439, are quite distinguishable from the case at bar.

*Exceptions overruled.*